Filed 5/7/18

# CERTIFIED FOR PARTIAL PUBLICATION†

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>　　v.<br><br>JEFFREY MINIFIE,<br><br>　　Defendant and Appellant. | B270485<br><br>(Los Angeles County<br>Super. Ct. No. BA394178) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Henry J. Hall, Judge. Affirmed.

Ralph H. Goldsen, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Shawn McGahey Webb and David A. Voet, Deputy Attorneys General, for Plaintiff and Respondent.

---

† Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication, except for the Factual Background and parts A and B of the Discussion.

On the morning of February 16, 2012 Minifie forced his ex-girlfriend Lillian Pleitez into the passenger seat of his vehicle and drove away. After a witness called 911, Minifie was followed by two police cars. A high-speed chase ensued through the streets just west of downtown Los Angeles, with Minifie running through multiple red lights. The chase ended when Minifie swerved into oncoming traffic and collided with another vehicle head-on. Pleitez died on the way to the hospital.

The jury found Minifie guilty of second degree murder (Pen. Code, § 187, subd. (a); count 1),[1] kidnapping (§ 207, subd. (a); count 2), and evading an officer causing injury (Veh. Code, § 2800.3, subd. (a); count 3). Minifie waived his right to a jury trial on his alleged prior convictions, and admitted he had suffered three prior convictions. The court found that Minifie had served three prior separate prison terms within the meaning of section 667.5, subdivision (b).

On count 1 the trial court sentenced Minifie to an indeterminate term of 15 years to life. On count 2 the trial court sentenced Minifie to the upper term of eight years, to run consecutively. The trial court imposed three one-year prior prison term enhancements under section 667.5, subdivision (b), on both counts 1 and 2. On count 3 the trial court sentenced Minifie to a consecutive term of one year eight months (one-third the middle term). Minifie was sentenced to an aggregate state prison term of 30 years eight months to life.

In the unpublished part of the opinion, we conclude that Pleitez's statements expressing her fear to her daughter

---

[1] All undesignated statutory references are to the Penal Code.

approximately two hours before the kidnapping were properly admitted under the state of mind exception to the hearsay rule. We also reject Minifie's claims of instructional error and prosecutorial misconduct.

In the published part of the opinion, we address whether a trial court may impose prior prison term sentence enhancements under section 667.5, subdivision (b), separately to an indeterminate term of imprisonment and a determinate term of imprisonment as part of the defendant's aggregate sentence. We conclude the trial court properly imposed the enhancements on both the indeterminate and determinate terms. We affirm.

## FACTUAL BACKGROUND

A.    *The Prosecution's Case*

As of February 2012 Minifie had been dating Lillian Pleitez for eight to 12 months. Minifie lived in an apartment on Wilshire Boulevard (the Building), just west of downtown Los Angeles. Pleitez lived with her daughter, J.P.

At about 8:00 a.m. on February 16, 2012 Jeffery and Angela Cho,[2] who also lived at the Building, were attempting to leave the Building's parking lot using the Ingraham Street exit. Minifie's sport utility vehicle (SUV) was blocking the exit. Jeffery observed Minifie and Pleitez standing outside the SUV, arguing. Minifie was substantially taller than Pleitez.[3] Minifie put his

---

[2]    Because Jeffery and Angela share the same last name, we will refer to them by their first names to avoid confusion.

[3]    Minifie testified that he was six feet, one inch tall and weighed 200 pounds, and that Pleitez was about a foot shorter.

hands on Pleitez, and pushed her toward the passenger side of the vehicle.  Pleitez appeared to be resisting him.

Minifie opened the front passenger door, pushed Pleitez into the seat, and closed the door.  As Minifie walked back to the driver's side, the passenger door opened, and Pleitez tried to get out.  Minifie returned to the passenger side, and got in.  He sat on top of Pleitez while she struggled; he shut the door, and then slid over Pleitez to the driver's seat.

Pleitez made eye contact with Jeffery, and appeared to be asking for help.  She held up her arm and showed Jeffery a white band on her wrist.  At this point Jeffery told Angela to call 911.

Minifie then drove out of the garage with Pleitez in the passenger seat.  He turned left, and headed east on Ingraham Street.  Jeffery followed him, while Angela called 911 from the passenger seat.  While the SUV was moving, the passenger door opened, then the SUV stopped, and the door closed.  The SUV continued driving.  The SUV turned on Lucas Street, but got stuck in stop-and-go traffic.  Jeffery honked his horn to let Minifie know he was following him.  Minifie then began driving erratically, weaving in and out of traffic.  At some point the SUV made a turn, and Jeffery lost sight of the vehicle.  Shortly thereafter the 911 operator directed Jeffery to the scene of a traffic accident on Sixth Street, and he saw the same SUV was there.

Sonny Chang, who also lived at the Building, was in his car waiting to exit the parking lot.  He was behind two vehicles, one of which was blocking the parking gate.  He heard Minifie and Pleitez yelling and screaming.  He saw Pleitez try to get out of the SUV.  She then jumped out, and asked for help.  Minifie

4

forced her back into the SUV, and drove away. Chang called 911, and reported the incident.

At around 8:00 a.m. Los Angeles Police Department (LAPD) Officer Jose Delgado was driving north on Bixel Street in his black and white police car with his partner James Le when he saw Minifie's SUV cross a double yellow line, make an illegal U-turn, and drive onto the sidewalk. Delgado tried to get closer to the SUV, but it sped off north on Bixel Street.

When the SUV approached Wilshire Boulevard, the passenger door opened, and Pleitez tried to jump out of the vehicle. Half of her body was outside the vehicle. Minifie then drove through a red light at the intersection of Wilshire Boulevard and Bixel Street, causing other vehicles to screech to a halt.

At Sixth Street, the SUV's passenger door swung open again, and Pleitez tried to "dive" out of the SUV. Minifie made a left turn onto Sixth Street and pulled Pleitez back into the SUV. Minifie went through another red light and made a left turn, again causing cars to screech to a halt. At this point Minifie was driving over 70 miles per hour. Delgado activated his lights and sirens, and continued in pursuit.

At Sixth and Alvarado Streets, Minifie, who was driving westbound, began swerving into the eastbound lane toward oncoming traffic, to evade Delgado's police car. Minifie did this two times, then jumped back into the westbound lane. At the intersection of Sixth and Carondelet Streets, Minifie swerved into the eastbound lane for the third time, and collided head-on with a Volvo heading east on Sixth Street. Minifie's SUV was upended and stood on its front two wheels, then fell down onto all four wheels. As soon as the car landed on its four wheels, Minifie got

5

out of the driver's side door and began running south on Carondelet Street.  Minifie did not check on his passenger or the driver of the Volvo.

Delgado and Le pursued Minifie, following him in their vehicle.  Minifie pulled his wallet out of his pocket, threw it into the bushes, then continued to run southbound.  Delgado and Le yelled at Minifie to stop, but he kept running.  When Minifie started running toward a fence, it looked like he was going to jump over it.  Delgado and Le got out of their vehicle, and ran toward Minifie.  Delgado told Minifie to get on the ground, but he did not comply.  Instead, Minifie clenched his hands into fists and started walking toward Delgado.  Delgado struck Minifie across his abdomen with his baton.  Other officers arrived, and Minifie was taken into custody.  Delgado described Minifie as "altered," and he believed Minifie was possibly under the influence.

Anita Williams was the driver of the Volvo.  She was stopped at a red light with cars on either side of her.  She saw Minifie's SUV weaving in and out of traffic, with police cars in pursuit.  Then the SUV drove through a red light and headed straight toward Williams.  Williams attempted to change lanes to get out of the way, but the SUV also changed lanes, and hit her head-on at about 70 miles per hour.  Williams testified, "Whatever lane I was getting in he was headed for me."  The SUV pushed her car backwards, and she was seriously injured, including a severely broken arm, three to four broken ribs, a broken sternum, and a punctured lung.

LAPD Officer Nicholas Landry had been following Delgado in his police car during the pursuit.  He went up to the SUV after the collision, and found Pleitez on the passenger side with her shoulders and torso wedged against the floorboard.  She was

6

bleeding profusely.  She was still breathing, and appeared to be asking for help.

Pleitez was transported to the hospital, but bled to death due to multiple traumatic injuries, including a torn aorta and bleeding in her brain.  According to Dr. Louis Pena, a forensic pathologist who performed an autopsy, Pleitez's traumatic injuries were consistent with the impact from a car accident.  She also had injuries that were not caused by the collision, including bruised, swollen, and bloody eyes, which were consistent with being hit in the face with an object or a fist or elbow.  Pleitez's upper and lower lips were bruised and torn, consistent with her being hit in the mouth.  She had a two and a half-inch cut on her left wrist that was covered by a bandage.  The cut was caused by a straight object, and had marks indicating it could have been a suicide attempt.  She had a small amount of cocaine in her system.

LAPD Officer Kamaron Sardar, a drug recognition expert, examined Minifie at the hospital.  Sardar was unable to conduct field sobriety tests because Minifie was restrained in a bed.  However, Sardar examined Minifie, and checked his blood pressure and pulse rate.  He observed that Minifie had a white, powdery substance in his nostrils, and his nostril and the septum dividing the two parts of his nose were red and inflamed, consistent with snorting cocaine.  Sarder also spoke with officers at the scene who described Minifie as agitated and aggressive, with fidgety behavior.

Sardar stated that cocaine use causes impairment of reaction time, excitement, and agitation, and increases aggressiveness.  Based on Minifie's actions and his statements to Sarder and to officers at the scene, Sardar opined that Minifie

was under the influence of and impaired by cocaine, but he was not suffering from a cocaine overdose. Blood tests confirmed that Minifie had ingested a "high" amount of cocaine.

J.P. testified that her mother, Pleitez, was dating Minifie. Pleitez often went out with Minifie at night, but she usually returned home after seeing him. On February 15, 2012 Pleitez went out, but did not return home. J.P. tried calling her, but she did not answer. When J.P. got up at about 6:00 a.m. the morning of February 16, she saw five or six missed calls from Pleitez on her phone. Sometime between 6:18 and 6:30 a.m. J.P. called her mother back, and talked to her on the phone. Pleitez sounded scared and spoke in "code." Pleitez told J.P. that Minifie had hit her and that "her life was in [J.P.'s] hands." She asked J.P. to come with J.P.'s aunt to pick her up. J.P. and her aunt went to Minifie's apartment, but no one was there when they arrived.

B.     *The Defense Case*

Dr. Terrence McGee, an expert in drug addiction, testified about the effects of cocaine. He reviewed the results from the drug tests given to Minifie at the hospital, and stated that Minifie had ingested "an enormous amount of cocaine," which amount would cause a person to behave irrationally and violently. Dr. McGee was asked a hypothetical question about an individual evading the police by driving recklessly at high speeds with officers pursuing him, getting into a traffic collision, fleeing on foot, then challenging the officers to a fight. Dr. McGee opined that if this individual had ingested the amount of cocaine reflected in Minifie's test results, he would have been clearly under the influence of cocaine, which would have affected his

8

judgment and his ability to form an intent or plan to do something.

Minifie testified on his own behalf.  He had been dating Pleitez for around eight months.  He loved her and they planned to get married.  However, they used to argue.  He admitted he had four convictions for crimes of "moral turpitude" over the prior 11 years.

On the night of February 14, 2012 Minifie had taken Pleitez out to dinner for Valentine's day.  The following day he picked her up at the car dealership in Studio City where she worked, and took her back to his apartment.  Pleitez left her car at the dealership.  Pleitez took a shower, and Minifie snorted "a little bit" of cocaine.  He used cocaine regularly because it made him "high," and gave him energy.

After her shower, Pleitez told Minifie that he should return the wedding dress he had bought for her to wear at their wedding.  He was angry, but responded, "okay, whatever."  He explained that Pleitez sometimes said things like that to get a reaction out of him, so he acted like he did not care.  Pleitez then told Minifie that he should give the dress to his friend Daisy.  Minifie described Daisy as "just a friend," but Pleitez was jealous of his relationship with her.  Minifie got mad and slapped Pleitez across the face with his hand two or three times.  In response, Pleitez picked up a wine or champagne glass, and hit Minifie on the head.

Pleitez then lay down on Minifie's bed, crying, and said she wanted to kill herself.  Minifie was still angry, so he told her, "okay."  He went to the kitchen, got a knife, and handed it to her.  He said, "Here, go ahead."  She took the knife and cut her left wrist open.  Minifie was shocked; there was a lot of blood.  He

9

took the knife from Pleitez, and used napkins and tape to bandage her wrist.  He did not call 911 or take her to the hospital.

Before Minifie and Pleitez left his apartment, Pleitez called her daughter, and spoke to her in Spanish.  Minifie did not know what she was saying.  Minifie and Pleitez both snorted some cocaine.  Minifie then took Pleitez out for breakfast at McDonald's.  During the drive back to Minifie's apartment, Pleitez got mad at Minifie because he had given away two cases of makeup that he previously had in his car.  Minifie told Pleitez he gave the makeup to Daisy to sell, but Pleitez began yelling at him that he was a liar.  According to Minifie, Pleitez got angry because she was jealous of Daisy.

Minifie decided to take Pleitez back to her car.  They were at the gate to Minifie's parking garage when Minifie told this to Pleitez.  Pleitez started acting "crazy" and yelled at him.  She got out of the car.  Minifie also got out of the car, grabbed Pleitez, and said, "Come on, let's go.  I'm taking you back to your car." They got back in the car, and Pleitez tried to rip the bandage off her wrist, causing her wrist to bleed again.  She then got out of the car and said, "This is your fault."  She was holding her wrist and trying to take off the tape.  This scared Minifie, and he "got her and put her in the car."  Then he "got in with her."  He was going to take her to the hospital and tell them that she cut her wrist.

However, Minifie did not take Pleitez to the nearby hospital because she was screaming and yelling that she did not want to go.  Minifie drove out of the parking garage while holding Pleitez's wrist.  He saw there was a police car behind him, and started driving "to get away from them."  He conceded he did not

drive safely. Pleitez tried to "fall out of the car" while he was driving, but he pulled her back in. He was concerned she might die if she jumped out of the car because he was driving fast. He drove in different lanes, then ran into a car. As he was driving, he was not "thinking at that time." He did not intend to hit the car, but when he was trying to get around the cars he got into a lane where there was a car heading toward him. He did not plan to kidnap, hurt, or kill Pleitez.

On cross-examination Minifie admitted that he hit Pleitez in the eyes, causing her swollen eyes. After she hit him with the glass, he pushed her in her mouth. Minifie acknowledged he was driving fast and that he knew this was dangerous, although he denied he was going 70 miles per hour. He also knew that running a red light could cause death or serious injury to other people and that driving on the other side of the road could kill people.

Minifie testified that Pleitez was resisting getting in his SUV, adding, "I just pulled—grabbed her wrist and pulled her." "She didn't want to go to her car." When asked, "it was your intent to get her into your car; isn't that right," Minifie answered, "I think so. Yeah." Minifie admitted that once he got Pleitez into his SUV, he got into the passenger side while Pleitez was sitting in the seat because she would not stay in the car and did not want to go to the hospital. When asked, "it was your intent not to let her leave the car, right," he answered, "Yeah. I had to get her to a hospital."

11

# DISCUSSION

A. *The Trial Court Did Not Abuse its Discretion in Admitting Pleitez's Statements to J.P.*

    1. *The People's Offer of Proof and the Trial Court's Ruling*

Prior to J.P.'s testimony, the prosecutor made an offer of proof that he "plan[ned] to call the victim's daughter [J.P.] who would testify to statements the victim made to her. She did testify to the statement at the prelim[inary hearing] indicating she . . . was contacted by the victim. The victim was scared and the victim made a comment that, 'Come get me. He won't let me leave. He's hitting me,' and to the effect, 'If you don't come and get me my life is in your hands.'"

Defense counsel objected to admission of the testimony as hearsay. The trial court overruled the objection, explaining: "I believe under Evidence Code section 1250 that those statements if I understand them were statements by the declarant [showing her] state of mind. One of the issues in terms of the kidnapping charge is her consenting to [go] with the defendant. . . . [T]hose statements would suggest that—or tend to suggest that her state of mind was such that she was not voluntarily going with the defendant. She wished to get away from the defendant. And because of that under Evidence Code section 1250[4] those

---

[4] Evidence Code section 1250, subdivision (a), provides that "evidence of a statement of the declarant's then existing state of mind, emotion, or physical sensation (including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health) is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove the declarant's state of mind,

[statements] are relevant to prove her state of mind and be offered to explain act or conduct by [Pleitez]."

Minifie contends the trial court erred in admitting J.P.'s testimony because Pleitez's state of mind at 6:18 a.m. was not relevant to prove her mental state two hours later when Minifie allegedly kidnapped her. Minifie also contends the testimony was prejudicial, as evidence of Minifie's bad character.

### 2. *Standard of Review*

We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Grimes* (2016) 1 Cal.5th 698, 711; *People v. Guzman* (2017) 11 Cal.App.5th 184, 191.) "Whether a trial court has correctly construed [an Evidence Code provision], however, [is] a question of law that we review de novo." (*Grimes*, *supra*, at p. 712; *Guzman*, *supra*, at p. 191.)

### 3. *Pleitez's State of Mind Was Relevant To Prove Her Lack of Consent*

In order to convict Minifie of kidnapping, the prosecution needed to prove that Minifie moved Pleitez by force or fear without her consent. (See *People v. Sattiewhite* (2014) 59 Cal.4th 446, 475; *People v. Alvarez* (2016) 246 Cal.App.4th 989, 1002; see also CALCRIM No. 1215.) At the time of the trial court's evidentiary ruling, Pleitez's consent was at issue.[5]

---

emotion, or physical sensation at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain acts or conduct of the declarant."

[5] In his opening brief Minifie argued that consent was not an issue because he admitted in his testimony that Pleitez did not consent to go in Minifie's car. However, in his reply brief, Minifie

13

Minifie argues that evidence of a victim's state of mind must be contemporaneous with the state of mind at issue, that is, whether Pleitez consented to go in Minifie's car at 8:00 a.m. However, the exception for evidence of a witness's state of mind under Evidence Code section 1250, subdivision (a), applies when "[t]he evidence is offered to prove the declarant's state of mind, emotion, or physical sensation at that time *or at any other time* when it is itself an issue in the action." (Italics added.)[6]

Where a victim's hearsay statements are relevant to an issue in dispute, even when they are made hours to months before the crime, the statements are admissible under the state of mind exception. (See *People v. Waidla* (2000) 22 Cal.4th 690, 708-710, 723 [murder victim's statements that she feared the defendant made up to two months before her death were admissible to show she did not consent to allow the defendant into her house, which was relevant to burglary and robbery charges]; *People v. Thompson* (1988) 45 Cal.3d 86, 102, 105

---

withdrew this argument, conceding that, as of the time of the trial court's ruling, consent was still an issue. (See *People v. Hartsch* (2010) 49 Cal.4th 472, 491 [court declined to consider testimony given after the trial court's ruling on a motion to suppress, holding, "[o]ur review, of course, is limited to the evidence before the court when it heard the motion"].)

[6] Minifie urges this court to follow the state of mind exception to the hearsay rule under Federal Rules of Evidence, rule 803(3) (28 U.S.C.), under which "the statement must be contemporaneous with the mental state sought to be proven," citing *U.S. v. Carter* (7th Cir. 1990) 910 F.2d 1524, 1530. However, the federal rule is not applicable to a state court proceeding; rather, the language of Evidence Code section 1250, subdivision (a), controls.

14

[murder victim's statement to a friend "hours before her death," "Do you think [the defendant] would kill me?" was admissible to show she did not consent to have intercourse with the defendant, which was relevant to rape charge]; see also *People v. Crew* (2003) 31 Cal.4th 822, 829, 840 [murder victim's statement in the month of her murder that "'[i]f you don't hear from me in two weeks, send the police'" was admissible under Evid. Code, § 1250 to show she did not disappear "of her own accord" because of her emotional state, where her body was never recovered]; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 870-871, 885, 888-889 [murder victim's statements up to a month before her death that she feared the defendant were relevant to show that she left him out of fear, not to commit suicide, where the victim's body was never recovered].)

Minifie relies on the holding in *People v. Armendariz* (1984) 37 Cal.3d 573 to support his argument that Pleitez's statements were not relevant to her state of mind two hours later. However, in *Armendariz* the Supreme Court found inadmissible the testimony that 17 months before his death the victim told his son he was frightened because the defendant had demanded money, and threatened to assault him if he did not comply. (*Id.* at p. 585.) The prosecutor introduced this evidence to show that the defendant went to the victim's house the night of the murder to steal from him, not to sleep there, as the defendant had testified. (*Ibid.*) The court held the trial court's ruling was erroneous, stating, "[the son's] state of mind after hearing [the victim's] statement, as well as anything [the son] did in response to it, shed no light on any of the events which occurred 17 months later." (*Id.* at p. 586.) Here, Pleitez's statements shed light on her actions a mere two hours later.

15

Minifie's reliance on *People v. Noguera* (1992) 4 Cal.4th 599 is similarly misplaced.  In *Noguera*, the Supreme Court held that the hearsay statements of a victim that she feared the defendant were inadmissible under the state of mind exception, concluding that the statements, "when offered to prove the conduct of the accused, are not within the exception to the hearsay rule embodied in Evidence Code section 1250." (*Id*. at p. 622.)  The court found that the victim's state of mind was not at issue because the case focused on the identity of the killer, not the state of mind of the victim.  (*Ibid*.)

Here, as in *Waidla* and *Thompson*, Pleitez's statements between 6:18 and 6:30 a.m. suggesting she was fearful of Minifie were admissible to prove that two hours later Pleitez did not consent to get into Minifie's SUV.  Unlike in *Noguera*, the prosecution did not offer the statements to prove Minifie's conduct.  The fact that the statements were made two hours before the alleged kidnapping goes to the weight, not the admissibility of the evidence.  Similarly, whether Pleitez's statements to J.P. showed that she would have wanted to leave Minifie's apartment in his SUV, as argued by Minifie, was a question for the jury to decide.

Accordingly, the trial court did not abuse its discretion in finding that Pleitez's statements to J.P. were relevant to whether Minifie kidnapped Pleitez.  (*People v. Grimes*, *supra*, 1 Cal.5th at p. 711; *People v. Guzman*, *supra*, 11 Cal.App.5th at p. 191.)

4. *Evidence Code Section 352 Does Not Support Exclusion of Pleitez's Statements*

Minifie contends the admission of Pleitez's statements was prejudicial because the statements showed Minifie's bad

16

character and could have caused the jury to conclude he acted with malice rather than recklessness. Minifie also argues that the trial court was required to analyze whether the testimony was more prejudicial than probative under Evidence Code section 352, citing the Supreme Court's holding that "[e]ven if such evidence is relevant, we have stressed its potential prejudice and have required that the trial court engage in a careful weighing of its probative value against the danger of undue prejudicial effect on the jury." (*People v. Thompson, supr*a, 45 Cal.3d at p. 103.)

However, Minifie never objected at trial to the admission of J.P.'s testimony on the basis of its potential prejudice. Therefore, the issue is forfeited on appeal. (Evid. Code, § 353 [a judgment shall not be reversed based on an erroneous admission of evidence unless there was a timely motion to exclude that stated the specific ground of the objection]; *People v. Cowan* (2010) 50 Cal.4th 401, 476-477 [the defendant forfeited his argument that individual postmortem photographs should have been excluded under Evid. Code, § 352 because he failed to raise this objection before they were moved into evidence]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1124 ["Because the defense did not object on this ground at trial [under Evid. Code, § 352], the issue is not preserved for appellate review"]; see also *People v. Waidla, supra,* 22 Cal.4th at p. 723 [the defendant preserved his claim that the victim's statements that she feared him should have been excluded under Evid. Code, § 352 where "[h]e satisfied the specific-and-timely-objection rule not only adequately, but fully"].)[7]

_____

[7]     Minifie also argues for the first time in his reply brief that the trial court failed to give a limiting instruction that J.P.'s statements could not be considered for the truth of whether

17

Further, even if Minifie had not forfeited this argument, it would not have been an abuse of discretion for the trial court to have found the statements were "not substantially more prejudicial than probative." (*People v. Waidla*, *supra*, 22 Cal.4th at p. 724 [applying abuse of discretion standard of review to trial court ruling that evidence was not substantially more prejudicial than probative].) First, because Pleitez's lack of consent to enter Minifie's SUV was an element of the kidnapping charge, the statements by Pleitez that Minifie hit her and that "her life was in [J.P.'s] hands" were highly probative of Pleitez's lack of consent.

As to the potential prejudice to Minifie, the statement by Pleitez that Minifie hit her was cumulative to Minifie's own testimony that he slapped her across her face two or three times and pushed her in the mouth, as well as Dr. Pena's testimony that Pleitez's bruised and swollen eyes were consistent with being hit in the face and her bruised and torn lips were consistent with her being hit in the mouth.

Pleitez's statement that her life was in J.P.'s hands was a single "rather isolated statement," minimizing its potential for prejudice. (*People v. Thompson*, *supra*, 45 Cal.3d at p. 104.) While Minifie contends this statement may have biased the jury

_____

Pleitez was at risk of harm by Minifie. However, as the Supreme Court has held, "the court has no duty to give a limiting instruction absent a request." (*People v. Rodriguez* (2014) 58 Cal.4th 587, 647-648; accord, *People v. Smith* (2007) 40 Cal.4th 483, 516 ["'absent a request by [the] defendant, the trial court has no sua sponte duty to give a limiting instruction'"].) Accordingly, by not requesting a limiting instruction in the trial court, Minifie has not preserved the issue for appeal.

to find malice supporting a conviction for second degree murder, to prove second degree murder based on implied malice the jury had to find that at the time of the accident Minifie "knew his act was dangerous to human life" and that he "deliberately acted with conscious disregard for human life." (CALCRIM No. 520; see *People v. Butler* (2010) 187 Cal.App.4th 998, 1008 ["Implied malice murder requires a defendant's conscious disregard for life, meaning that the defendant subjectively appreciated the risk involved"].)

Thus, the central question for the jury was whether Minifie appreciated that his driving 70 miles per hour and swerving into oncoming traffic was dangerous to human life. Whether Pleitez was fearful of Minifie hurting her two hours before the accident would therefore not likely have had a significant impact on the jury's determination of whether Minifie was aware his reckless driving could result in death or great bodily injury or that he acted at the time of his driving with "conscious disregard for human life." Any prejudice from this statement was therefore minimal, and did not substantially outweigh the probative value.

B.    *The Trial Court Did Not Err in Instructing the Jury on Involuntary Manslaughter*

1.    *Standard of Review*

"We review the wording of a jury instruction de novo to assess whether the instruction correctly states the law." (*People v Lua* (2017) 10 Cal.App.5th 1004, 1013; accord, *People v. Posey* (2004) 32 Cal.4th 193, 218.) """A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant.

[Citations.]' [Citation.] "'[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.'"" [Citation.]' [Citation.]" (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 905; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1028; *People v Lua, supra*, 10 Cal.App.5th at p. 1013.) ""It is fundamental that jurors are presumed to be intelligent and capable of understanding and applying the court's instructions." [Citation.]' [Citation.]" (*Covarrubias, supra*, at p. 905; accord, *Richardson, supra*, at p. 1028; *Lua, supra*, at p. 1013.)

2.  *The Trial Court's Jury Instructions on Intent and Involuntary Manslaughter*

The trial court instructed the jury with CALCRIM No. 252, modified to read, "Each of the crimes and the special circumstance charged in the Information require proof of the union, or joint operation, of act and wrongful intent, *except for the crime of involuntary manslaughter*, which is a lesser-included charge of the crime of murder as alleged in Count One of the [I]nformation." (Italics added.)  It is undisputed that the italicized language was added by the trial court.  The instruction also stated, "The act and the specific intent and/or mental state required for each crime . . . are explained in the instruction for that crime . . . ."

The trial court next instructed the jury with CALCRIM No. 253, "Union of Act and Intent: Criminal Negligence,"[8] which

_____

8       Minifie claims, without citation to the record, that CALCRIM No. 253 "did not immediately follow" CALCRIM

20

explained, "In order to be guilty of the lesser-included crime of involuntary manslaughter in violation of . . . section 192[, subdivision] (b), a person must do an act with criminal negligence.  Criminal negligence is defined in the instructions on that crime."[9]

The trial court instructed the jury on the elements of involuntary manslaughter with CALCRIM No. 580, stating that the defendant committed involuntary manslaughter if he or she "committed the act with criminal negligence."  Further, "A person acts with criminal negligence when:  [¶]  1. He or she acts in a reckless way that creates a high risk of death or great bodily injury; [¶] AND [¶] 2. A reasonable person would have known that acting in that way would create such a risk."

> 3. *There Is No Reasonable Likelihood That the Jury Understood the Trial Court's Instructions To Mean Involuntary Manslaughter Does Not Require Criminal Negligence*

Minifie acknowledges that the trial court correctly instructed the jury on the elements of implied malice murder and involuntary manslaughter.  He contends, however, that the trial court erroneously modified CALCRIM No. 252 to suggest there

---

No. 252.  The record shows that the trial court instructed the jury in succession with CALCRIM No. 252, then No. 253.

[9]     The trial court also instructed the jury on circumstantial evidence that "The People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent and/or mental state.  The instructions for each crime and allegation explain the intent and/or mental state required for that crime and/or allegation."  (CALCRIM No. 225.)

21

does not need to be a union of act and intent or mental state for involuntary manslaughter. This error, he argues, could have caused the jury to believe that involuntary manslaughter is a strict liability offense, and does not require a showing of criminal negligence. We disagree.

In reviewing the trial court's instructions, we must consider the effect of all the instructions together. (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 905.) The trial court did not err in modifying CALCRIM No. 252 to exclude involuntary manslaughter because, unlike implied malice murder, involuntary manslaughter does not require that the defendant have a wrongful intent or mental state; rather, the People must prove that "[a] reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 580; *People v. Butler*, *supra*, 187 Cal.App.4th at p. 1008.)

As the Supreme Court held in *People v. Garcia* (2001) 25 Cal.4th 744, "'[T]he requirement that, for a criminal conviction, the prosecution prove some form of guilty intent, knowledge, *or criminal negligence* is of such long standing and so fundamental to our criminal law that penal statutes will often be construed to contain such an element despite their failure expressly to state it. . . .' [Citation.] In other words, there must be a union of act and wrongful intent, or criminal negligence." (*Id*. at p. 754, italics added; see also § 20 ["In every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence"].) CALCRIM No. 253 states as to involuntary manslaughter that "a person must do an act with criminal negligence" and that criminal negligence is defined in the instruction for involuntary manslaughter. The instruction on involuntary manslaughter in turn defines criminal negligence to

22

require both that the defendant "act[] in a reckless way that creates a high risk of death or great bodily injury" and that "[a] reasonable person would have known that acting in that way would create such a risk." (CALCRIM No. 580.)

Similarly, any argument that the jury would believe that the act and the "criminal negligence" could happen at different times is without merit. The instruction that the defendant must "act[] in a reckless way that creates a high risk of death or great bodily injury" can only be understood to mean that at the time of the act, here Minifie's driving, the defendant was acting recklessly.

Minifie has therefore not met his burden to show there was """"a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant."""" (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 905.)

4. *Minifie Has Forfeited Any Claim of Prosecutorial Misconduct*

Minifie contends the prosecutor improperly stated in his closing argument, "Another thing is don't give the defendant a break, right? Don't say you know what? Of course he kidnapped her. Of course he intended to kidnap her and of course he caused [the] death of her. So, yeah, he's guilty of felony murder but, you know, I'm going to give him a break by giving him involuntary manslaughter or some lesser thing." Minifie asserts that the prosecutor's argument that the jury should not give Minifie "a break" led the jury to believe that it could only base a finding of involuntary manslaughter on a "break," and not criminal negligence.

23

However, Minifie acknowledges that he did not object to the prosecutor's argument at trial, and thereby forfeited any argument of prosecutorial misconduct. (See *People v. Jackson* (2016) 1 Cal.5th 269, 349 [""""To preserve a claim of prosecutorial misconduct for appeal, a defendant must make a timely and specific objection [at trial] and ask the trial court to admonish the jury to disregard the improper argument"""; failure to object is excused "only if an objection would have been futile or if an admonition would not have cured the harm caused by the misconduct"].)

Instead, Minifie seeks to recast his misconduct argument as tied to the trial court's failure to instruct on the requirement of a wrongful act and intent or mental state. However, the trial court's instructions were not erroneous, and therefore this argument has no merit. Any argument that the prosecutor improperly asked the jury not to give Minifie "a break" has been forfeited.[10]

---

[10] The trial court correctly instructed the jury on the elements of involuntary manslaughter. To the extent the prosecutor's argument was unclear about what was required to prove involuntary manslaughter, the trial court instructed the jury pursuant to CALCRIM No. 200, "You must follow the law as I explain it to you, even if you disagree with it. If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions." The jury is presumed to have understood and followed this instruction. (*People v. Covarrubias*, *supra*, 1 Cal.5th at p. 905; *People v. Richardson*, *supra*, 43 Cal.4th at p. 1028.)

C.     *The Trial Court Properly Imposed the Prior Prison Term Sentence Enhancements to Both the Indeterminate and Determinate Sentences*

Section 667.5, subdivision (b), provides for a one-year enhancement for each prior state prison term served by a defendant for a felony conviction where the defendant "did not remain free for five years of both prison custody and the commission of a new offense resulting in a felony conviction." (*People v. Tenner* (1993) 6 Cal.4th 559, 563; accord, *People v. Abdallah* (2016) 246 Cal.App.4th 736, 742.)  Minifie contends the trial court erred in imposing three one-year prior prison term enhancements on both the indeterminate and determinate sentences.  We disagree.

Minifie relies on the Supreme Court's holding in *People v. Tassell* (1984) 36 Cal.3d 77 (*Tassell*), overruled on other grounds in *People v. Ewoldt* (1994) 7 Cal.4th 380, 387, 401.  In *Tassell*, the defendant was convicted of kidnapping, rape, and oral copulation, on each of which the court imposed a sentence under the determinate sentencing law.[11]  The court considered whether the trial court properly applied the prior prison term enhancements

_____

[11]     "The Legislature in 1976 enacted the Uniform Determinate Sentencing Act (Stats. 1976, ch. 1139, p. 5061), commonly referred to as the determinate sentencing law (DSL). . . .  [¶]  The DSL's emphasis on uniform punishment marked a shift away from a system in which most prisoners were sentenced to an indeterminate range of years, usually with a maximum term of life imprisonment." (*People v. Sasser* (2015) 61 Cal.4th 1, 8 (*Sasser*).)

25

under sections 667.5, subdivision (b), and 667.6, subdivision (a),[12] to two of the determinate terms. The Supreme Court concluded that the enhancements should have been applied only once to the aggregate sentence, regardless of the number of determinate terms. (*Id*. at pp. 91-92.)

The court reasoned, "Section 1170.1 refers to two kinds of enhancements: (1) those which go to the nature of the offender; and (2) those which go to the nature of the offense. Enhancements for prior convictions—authorized by sections 667.5, 667.6 and 12022.1—are of the first sort. The second kind of enhancements—those which arise from the circumstances of the crime—are typified by sections 12022.5 and 12022.7: was a firearm used or was great bodily injury inflicted? Enhancements of the second kind enhance the several counts; those of the first kind, by contrast, have nothing to do with particular counts but, since they are related to the offender, are added only once as a step in arriving at the aggregate sentence." (*Tassell, supra*, 36 Cal.3d at p. 90.)

The Supreme Court next considered imposition of enhancements for prior convictions to multiple indeterminate sentences imposed on a third strike offender under the three strikes law (§§ 667, subds. (b)-(i), 1170.12) in *People v. Williams*

---

[12] Section 667.6, subdivision (a), provides for a five-year enhancement for "prior convictions of recidivist sex offenders." (*Tassell, supra*, 36 Cal.3d at p. 91.) The court noted that "there is no indication that [the Legislature] intended that such enhancements [under section 667.6, subdivision (a)] be otherwise treated differently than those in section 667.5." (*Ibid*.)

(2004) 34 Cal.4th 397 (*Williams*).[13] The court in *Williams* reaffirmed its prior holding in *Tassell*, as it applied to determinate terms, holding that "when imposing a *determinate* sentence on a recidivist offender convicted of multiple offenses, a trial court is to impose an enhancement for a prior conviction only once to increase the aggregate term, and not separately to increase the principal or subordinate term imposed for each new offense." (*Williams*, at p. 400, fn. omitted.)

The court concluded, however, that the holding in *Tassell* did not apply to indeterminate sentences imposed under the three strikes law. (*Williams*, *supra*, 34 Cal.4th at p. 402.) The court held, "As this court has stated, '[t]he consecutive sentencing scheme of section 1170.1 does not apply to indeterminate life terms, and therefore it has no application to sentencing calculations for three strikes defendants.' [Citations.] Because *Tassell* relied on section 1170.1, which does not apply to third strike sentences, it is not controlling or even helpful here in this significantly different context. [Citation.]" (*Id*. at pp. 402-403.)

_____

[13] The court in *William*s considered imposition of sentence enhancements for prior serious felony convictions imposed under section 667, subdivision (a)(1). (*Williams*, *supra*, 34 Cal.4th at pp. 400-401.) That subdivision provides, "any person convicted of a serious felony who previously has been convicted of a serious felony in this state . . . shall receive, in addition to the sentence imposed by the court for the present offense, a five-year enhancement for each such prior conviction on charges brought and tried separately." (§ 667, subd. (a)(1).) The Supreme Court in *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1163-1164, confirmed the *Tassell* rule applies to enhancements under section 667, subdivision (a)(1). (See *Sasser*, *supra*, 61 Cal.4th at pp. 10-11.)

In reaching its holding, the court noted, "The Three Strikes law, unlike section 1170.1, does not draw any distinction between status enhancements, based on the defendant's record, and enhancements based on the circumstances of the current offenses, and the Three Strikes law generally discloses an intent to use the fact of recidivism to separately increase the sentence imposed for each new offense.  Accordingly, . . . under the Three Strikes law, section 667[, subdivision] (a) enhancements are to be applied individually to each count of a third strike sentence." (*Williams*, *supra*, 34 Cal.4th at pp. 404-405.)

The Supreme Court again considered enhancements for prior convictions in *Sasser*, in which the court concluded that when multiple second-strike sentences are imposed under the three strikes law, *Tassell* applies, and a prior conviction enhancement may be added only once to the aggregate sentence.[14]  (*Sasser*, *supra*, 61 Cal.4th at pp. 6-7.)  The court observed that multiple second-strike sentences, in contrast to third-strike sentences, are determinate sentences governed by both the three strikes law and section 1170.1.  (*Sasser*, at p. 13.)

The court explained, "Once it is understood that [the defendant's] enhancements for prior convictions are governed by section 1170.1, *Tassell's* interpretation of that statute controls. As *Tassell* explained, section 1170.1 draws an important distinction between offense-based enhancements, which apply to every relevant count, and status-based enhancements, which apply only once."  (*Sasser*, *supra*, 61 Cal.4th at p. 15.)

---

[14]    As in *Williams*, the court in *Sasser* considered application of a prior serious felony enhancement under section 667, subdivision (a)(1).  (*Sasser*, *supra*, 61 Cal.4th at p. 6.)

The Supreme Court has not addressed the imposition of enhancements for prior convictions in the context before us, where the trial court sentenced the defendant to an indeterminate sentence based on the nature of the crime, not the three strikes law, and a determinate sentence imposed under the determinate sentencing law.[15]  The Fourth Appellate District in *People v. Misa* (2006) 140 Cal.App.4th 837 (*Misa*) addressed a similar sentencing issue in the context of a sentence enhancement under section 667, subdivision (a)(1).  In *Misa*, the trial court sentenced the defendant to an indeterminate life sentence on a torture count and a determinate sentence on one assault count, and stayed punishment on a second assault count. The court imposed separate five-year enhancements under section 667, subdivision (a)(1), on both the indeterminate sentence on the torture count and the determinate sentence on the assault count.  (*Misa, supra*, at p. 841.)

The court noted that the analysis of the *Williams* court as to enhancement of indeterminate sentences was not dispositive because the court's reasoning was based on the fact the defendant was sentenced under the three strikes law, whereas the defendant in *Misa* was sentenced to an indeterminate sentence based on the nature of the offense.  (*Misa, supra*, 140 Cal.App.4th

---

[15]    In *Sasser*, the trial court imposed five-year enhancements under section 667, subdivision (a), on each of the nine indeterminate sentences, in addition to the enhancements it imposed on the two determinate terms.  However, as the Supreme Court noted, the defendant did not challenge the trial court's imposition of enhancements for prior convictions on the indeterminate terms, and therefore this was not at issue on appeal.  (*Sasser, supra*, 61 Cal.4th at p. 7.)

at pp. 845-846.) However, the court concluded that "the statutory language in section 667, subdivision (e) that the *Williams* court relied on in part to determine that the prior conviction enhancement must be applied to multiple strike offenses in third strike cases also applies to second strike sentences and thus supports the conclusion that a logical application of the *Williams* analysis in this context would require the imposition of the prior conviction enhancement on [the defendant's] second strike offense (the torture count) notwithstanding that the enhancement was also imposed as a status enhancement relating to the determinate term on the assault count." (*Id.* at p. 846.)

The court in *Misa* also based its holding on the *Williams* court's reliance in part "on the fact that the section 667, subdivision (a) enhancement was enacted as part of a statutory and constitutional scheme intended to increase sentences for recidivist offenders." (*Misa, supr*a, 140 Cal.App.4th at p. 846, citing *Williams, supra*, 34 Cal.4th at p. 404.)

Here, unlike *Williams* and *Misa*, Minifie was not sentenced under the three strikes law, either as a second or third strike offender. However, "sections 667, subdivision (a) and 667.5 have the same purpose—increasing the duration of prison terms for recidivists." (*People v. Garcia* (2008) 167 Cal.App.4th 1550, 1561 [applying reasoning in *Williams* to find that § 667.5 enhancement may be applied separately to each indeterminate sentence]; see also *People v. Coronado* (1995) 12 Cal.4th 145, 156 ["Prior prison term enhancements, such as those authorized by [§] 667.5[, subd.] (b), . . . are attributable to the *defendant's status* as a repeat offender"].)

Moreover, imposition of an enhancement for a prior conviction on both the indeterminate and determinate sentences

30

is consistent with the separate statutory sentencing schemes for indeterminate and determinate term crimes. As this court held in *People v. Neely* (2009) 176 Cal.App.4th 787, "Sentencing under these two sentencing schemes must be performed separately and independently of each other. [Citation.] Only after each is determined are they added together to form the aggregate term of imprisonment." (*Id.* at p. 797.) The court described this approach "as sentencing in separate boxes," concluding on the facts before the court, "the indeterminate term crime . . . is placed in one box. The court imposes the required . . . life sentence and, in the same box, adds any enhancements to that sentence. . . . [¶] A second box is created to include the three determinate sentence crimes. . . . [¶] After these calculations, the second box would be complete and contain the total sentence for all the determinate sentence crimes. The court would add the term of the second box to the term of the first box to arrive at the total aggregate sentence." (*Id.* at pp. 798-799, fn. omitted.)

We therefore look to the sentencing schemes applicable to indeterminate and determinate sentences to determine whether the prior prison term enhancements should be applied separately to the indeterminate sentence "box" and determinate sentence "box." We conclude that the enhancements should be applied to both.

An indeterminate sentence imposed consecutively to a determinate sentence is governed by section 669, subdivision (a), section 1168, subdivision (b), and rule 4.451(a) of the California Rules of Court. (*People v. Lyons* (1999) 72 Cal.App.4th 1224, 1228; see also *People v. Felix* (2000) 22 Cal.4th 651, 656.) Section 669, subdivision (a), provides in pertinent part, "Life sentences, whether with or without the possibility of parole, may be imposed

31

to run consecutively with one another, *with any term imposed for applicable enhancements*, or with any other term of imprisonment for a felony conviction." (Italics added.) Section 1168, subdivision (b), provides, "For any person not sentenced under such provision [the determinate sentencing law], but who is sentenced to be imprisoned in the state prison . . . , the court imposing the sentence shall not fix the term or duration of the period of imprisonment."[16]

As to the determinate sentence, "Section 1170.1, which was enacted as part of the DSL, 'generally governs the calculation and imposition of a determinate sentence when a defendant has been convicted of more than one felony offense.' [Citation.]" (*Sasser*, *supra*, 61 Cal.4th at pp. 8-9.) Section 1170.1, subdivision (a), provides in pertinent part, "when any person is convicted of two or more felonies, . . . and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, *and any additional term*

---

[16]    California Rules of Court, rule 4.451(a) provides, consistent with *Neely*, "When a defendant is sentenced under section 1170 and the sentence is to run consecutively to . . . a sentence imposed under section 1168(b) in the same or another proceeding, the judgment must specify the determinate term imposed under section 1170 computed without reference to the indeterminate sentence, must order that the determinate term be served consecutively to . . . the sentence under section 1168(b), and must identify the proceedings in which the indeterminate sentence was imposed."

*imposed for applicable enhancements for prior convictions, prior prison terms,* and Section 12022.1." (Italics added.)[17]

Because section 669, subdivision (a), provides for imposition of "applicable enhancements" to the indeterminate sentence and section 1170.1, subdivision (a), provides for imposition of "applicable enhancements" to the determinate sentence, we conclude that the prior prison term enhancements under section 667.5, subdivision (b), are to be applied once to the indeterminate sentence and once to the determinate sentence, unless the court elects to strike the conviction under section 1385.[18] The trial court therefore properly imposed three one-year prior prison term enhancements on both the indeterminate and determinate sentences.

---

[17] Section 1170.1, subdivision (d), provides, "When the court imposes a sentence for a felony pursuant to Section 1170 [determinate sentence] or subdivision (b) of Section 1168 [indeterminate sentence], the court shall also impose, in addition and consecutive to the offense of which the person has been convicted, the additional terms provided for any applicable enhancements. . . ." This subdivision does not provide any guidance on whether the "additional terms provided for any applicable enhancements" are to be applied to the aggregate sentence or separately to the indeterminate and determinate sentences.

[18] A section 667.5, subdivision (b), prior prison term enhancement, in contrast to a section 667, subdivision (a), serious felony conviction enhancement, may be stricken pursuant to section 1385, subdivision (a). (*People v. Garcia, supra*, 167 Cal.App.4th at p. 1561.)

## DISPOSITION

The judgment is affirmed.

                                        FEUER, J.[*]

We concur:


        ZELON, Acting P. J.


        SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.